Filed 10/3/14  In re Justin N. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JUSTIN N. et al., Persons Coming Under the Juvenile Court Law. | B254868 (Los Angeles County Super. Ct. No. DK02905) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Petitioner and Respondent,<br><br>    v.<br><br>T.T.,<br><br>        Objector and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Phillip Soto, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Objector and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Jessica S. Mitchell, Deputy County Counsel for Respondent.

Appellant T.T. ("mother") appeals from the juvenile court orders declaring her son Justin, age 15, and daughter Alex, age 9, dependents of the juvenile court under Welfare and Institutions Code section 300, subdivision (b).[1] On February 10, 2014, the juvenile court found jurisdiction over the children based on evidence that mother abused drugs, which rendered her incapable of adequately supervising and providing regular care for the children. On appeal, mother argues that no substantial evidence supported the juvenile court's jurisdictional findings. Specifically, she contends that there was not substantial evidence submitted to prove that she was a substance abuser or that she was unable to provide regular care for Justin and Alex. Mother further contends that there was not substantial evidence presented to show that there were not reasonable means to protect Alex, other than to remove her from mother's care.

We find substantial evidence for the juvenile court's findings that mother's substance abuse resulted in her inability to adequately supervise and provide regular care for her children. We also conclude that there was substantial evidence that there were no reasonable means to protect Alex other than to remove her from mother's care. Thus we affirm the rulings of the juvenile court.

*Combined Statement of the Case and Summary of the Facts*

The family consists of mother, Justin and Alex. The family has a child welfare history dating back to 1998, when the Los Angeles County Department of Children and Family Services ("DCFS") received a referral alleging that mother was neglecting and emotionally abusing Justin. The referral was deemed substantiated. On November 11, 2004, DCFS received another referral alleging mother emotionally abused and neglected Alex, which also was deemed substantiated.

On August 25, 2013, DCFS received a referral alleging that mother was using and had been using methamphetamine for ten years, and that Justin was using methamphetamine and marijuana and was a known drug dealer at his school. The

_____

[1]    All references in this opinion to a "section" refers to the Welfare and Institutions Code, unless otherwise stated.

2

reporting party stated that Alex had stated that Justin made her smoke marijuana, that Alex knew what a "bong" was, and that mother had stayed up for three consecutive days as a result of using methamphetamine, and then "crashed" for one or two days thereafter. Mother had allowed a 23-year-old drug user to move into the family home, and Justin and the drug dealer recently went to the store together to purchase "bongs." The maternal grandmother ("grandmother") moved into the family home to help mother "get on her feet." The reporting party further stated that Alex had three vaginal infections in 2013, and several rashes due to bedbug infestations.

On August 26, 2013, grandmother called the investigating social worker at the DCFS to report the following: (a) she had observed Justin's drug paraphernalia in the family home when she lived there from January to July, 2013; (b) Justin was "lost;" (c) Alex had shown drugs that were located within the house to grandmother; (d) mother allowed a 23-year-old man to live at the home, who was a longtime and current drug user, and who bought "bongs" at garage sales.

On August 27, 2013, the social worker had an in-person interview with grandmother at DCFS's office. Grandmother reported that mother used drugs and that she had been a troubled youth. She was in foster care as a minor. Her first foster parents abused drugs and her second were neglectful. Mother took drugs and was a runaway. She further stated that mother neglected the children, that Justin wore dirty clothes, lied and stole, and there was cat urine all over the family home.

Later that day, the social worker made an unannounced home visit to the family's two bedroom apartment and interviewed mother and Alex. Mother laughed throughout the interview. Mother said that she and Alex shared a bedroom and that Justin shared a bedroom with Andrew, a 23-year-old man. When questioned about the drug allegations, mother denied using either methamphetamine or marijuana, and denied that there were "bongs" in the house. Mother claimed that Andrew only occasionally stayed overnight at their home and that when he did he slept in Justin's room. When questioned about the age disparity between Justin and Andrew, and the fact that a non-relative man was living

3

at the home, mother responded that she did not "really know Andrew that well." She then said that Andrew was moving out soon.

The social worker later met with both Alex and Justin, at which time they both denied the drug allegations. They both appeared neatly groomed dressed, healthy and nourished. Alex also denied ever seeing mother staying awake for several days followed by sleeping a lot.

The social worker also interviewed Andrew, who denied ever seeing mother use drugs, denied that he ever used drugs and denied witnessing any abuse of Alex or Justin.

On October 3, 2013, the social worker met at school with Alex, the school's principal Susan Gomez, and Alex's teacher Jamie Mond. Ms. Gomez was present during Alex's interview. Alex stated that Andrew had a "glass thing" that spilled, and that "There is [an] odor that smell like the glass thing, when they [Justin and Andrew] open and close the door to their room and the smell comes out into the hallway." She also said that a third person, Tyler, a friend of a friend of Justin's, now sleeps in Justin's bedroom as well. Alex said having strangers in her home scared her and made her sad because Justin was "being a bad person." She said that mother and Justin argued about him smoking in the home. She did not know what Justin was smoking, but said it smelled like the "glass thing."

Ms. Gomez reported that Justin "is a mess." She said that Justin was an "opportunity transfer" in middle school and was moved out of Walter Reed Middle School due to being a problem child as a result of mother's neglect. She further stated mother allowed Alex to walk home alone without any adult supervision, and that there had been a problem, over a period of weeks, with Alex not being picked up by anyone. Ms. Gomez stated that Alex was very vulnerable. She could not read, she processed things slowly, and she was on her own a lot. Ms. Gomez believed that Alex and Justin were neglected by mother. She said Alex did better when grandmother was living in the home with them.

Ms. Mond was also worried about Alex. She had previously written a letter to mother about Alex's incomplete school work. She said that Alex would come to class

4

appearing disheveled, often times wearing clothes that were too small for her, she did not complete her homework, and did not bring lunch or lunch money to school. She frequently was late in arriving at school.

On October 9, 2013, the social worker had a follow-up interview with mother, Justin, and Alex, at their home. Mother showed the social worker a yellow slip of paper signed by Pacific Toxicology Laboratory ("PTL") personnel, which indicated that mother submitted to a DCFS-requested drug test on August 27, 2013. The drug test result was positive for methamphetamine. Still, mother denied using any drugs.

On October 14, 2013, Susan G. ("Susan") and Van H. ("Van"), the parents of a friend of Alex, spoke with the DCFS social worker. Susan expressed concern for Alex because mother was unavailable and could not be reached during the time Alex slept over at their home for two to three days at a time. Susan said that she and Van became increasingly concerned about Alex because the child would go home with them because mother would leave her at school, even though the last pick-up time was 6:00 p.m. She was also concerned that Alex would walk home from school alone, which Susan believed was dangerous. She said that Alex was sent to school without food, her living situation was tenuous and mother had a history of drug use. Van expressed concern regarding his having observed a 23-year-old man living at Alex's home. Van said he had previously taken Alex home to find this man alone at the home. He was concerned about the children's well being.

On October 15, 2013, during a visit by the social worker at the family home, she advised mother that she needed to submit to a drug test and gave her a referral. Mother took the referral and said she would try to get tested. When the social worker recommended that a Team Decision Making meeting ("TDM") be held to discuss the family situation, mother said she would not attend.

On October 16 and 17, 2013, mother failed to submit to drug testing. The social worker called mother and recommended that she submit to drug testing the next day. Mother claimed that the children were well taken care of and that there was nothing wrong in their home. Mother asked for a guarantee that if she submitted to the drug test

5

she would not be required to attend a TDM. When the social worker said she could not make that guarantee, mother responded that she did not want DCFS in her life and did not want the social worker in her life or her family's life again.

On October 31, 2013, the social worker visited Justin at his school. He said that his mother would not allow him to speak to the social worker. The social worker then attempted to visit Alex at her school, but Ms. Gomez informed her that she had received a letter from mother instructing her that the social worker was not allowed to speak with Alex.

On November 18, 2013, DCFS received another referral alleging that mother neglected Alex, that Alex told the reporting party that mother hit and hurt her, and that Alex was frequently late for school, came to school unclean, and had uncombed hair.

On November 19, 2013, the social worker conducted an unannounced home visit. Mother refused to allow the children to speak with the social worker without her present. She denied that she hit Alex. In mother's presence Alex denied mother hit her. The social worker thought that Alex was too "scared" to tell the truth in front of mother.

On December 13, 2013, the social worker spoke with North Hollywood High School counselor Melissa Roberts. She reported that Justin withdrew from school on November 22, 2013. He was at that time failing every class, he was disruptive in class, failed to attend classes, failed to listen when he was in attendance, and there was no parental contact with the school. Ms. Roberts stated that "she wondered who was raising the child." Justin transferred to an "alternative school," Options for Youth, which had requested his records on December 2, 2013.

On December 13, 2013, Alex's school principal Ms. Gomez told the social worker that Alex rode her bicycle to school without a helmet because, she said, Justin had taken it from her.

On December 19, 2013, DCFS obtained a warrant for Alex's removal. A warrant for Justin's removal was denied, given his age.

On January 2, 2014, DCFS filed a section 300 petition on Justin and Alex's behalf, based on mother's history of substance abuse and current use of methamphetamines and

6

amphetamines. At the arraignment hearing, the juvenile court found Brian N. to be Justin's presumed father, while the identity of Alex's father was unknown. The court found that there was a prima facie case for detaining Justin and Alex in that they were minors described by section 300, subdivision (b). While Justin was released to mother's custody, the court detained Alex with grandmother. The court ordered monitored visits for mother with Alex. The court ordered DCFS to schedule a TDM with mother by January 9, 2014. Mother was ordered to submit to weekly random drug testing.

DCFS prepared a combined jurisdiction/disposition report for the February 10, 2014 adjudication/disposition hearing. Mother informed the social worked that Louis K. was Alex's father.

The dependency investigator interviewed mother, Justin, Alex, and grandmother regarding the substance abuse allegations made against mother. Mother denied having a history of drug abuse and denied that she currently used drugs. Mother denied that there had been any incidents regarding her sleeping for excessive periods of time as a result of withdrawing from drugs. She claimed that she took prescription pain medications for some mouth surgery, which caused her to sleep. When asked why she testified positive for methamphetamine and amphetamines on August 27, 2013, mother responded, "Apparently it came back positive. . . . I don't know; . . . it baffles me. I can't even articulate it. . . . I've searched for reasons; . . . everything has been blown out of proportion."

Justin denied observing mother using drugs, denied that he suspected mother used drugs, and denied observing mother sleeping for excessive periods of time. He said he had not seen her behave out of the ordinary. He said mother attended to all of his needs and that he felt loved and protected. He denied any concerns about himself, mother, or his home environment.

Alex said she did not know what drugs were, though she admitted that drugs were "something you can use . . . a bong . . . ." She denied seeing mother acting "weird" and denied that mother slept for excessive periods of time. Alex had been diagnosed with dyslexia and had an Individualized Education Plan ("IEP").

7

Grandmother said that mother had a drug problem and did not take responsibility for her actions. During the time grandmother lived with mother and the children, between January and June of 2013, she observed a methamphetamine pipe in the bathroom and a makeshift marijuana pipe in the cupboard of the home, within access of the children. Grandmoter used her cellular telephone to take pictures of the drug pipes that were located in the family home in March of 2013. She stated that after Alex saw those pictures on the cellular phone, she said to her "[G]randma, look what my mom and Justin put on your phone." She believed that comment by Alex showed that Alex was aware of the drug paraphernalia in the house. Grandmother also stated that she had previously observed mother "cleaning the cabinets all night long" and then "crash . . . go into a deep sleep for a full day. . . . [Mother] would get up, eat something, and then go right back to sleep."

Grandmother stated that mother had not entered a drug treatment program, and "[mother] had been unable to pull herself out [of using drugs] for the past four years. . . . [Mother] cycles . . . . [She] will clean herself up for a while and then use drugs again. . . ." Grandmother believed mother lost her job in 2009 due to her drug abuse.

Grandmother said that in August of 2013, mother burned her right arm, which grandmother suspected was the result of her "making meth." Mother minimized the injury, but she appeared disoriented from the incident.

Grandmother found empty prescription drug bottles under Justin's bed, with labels on them for people unknown to her.

Grandmother also reported that mother had not made herself available for any monitored visits with Alex since she was detained in December 2013. Grandmoter also attempted to leave voice mail messages on mother's cellular phone to schedule monitored visitation between mother and Alex, but mother reprogrammed her cellular phone so that she could not receive any voice mail messages.

Meanwhile, Alex was residing with grandmother and receiving IEP services at the "Learning Center" in a variety of subjects at her elementary school in Carlsbad,

8

California. She had good attendance, had not exhibited any behavioral problems at school and had established new friendships.

On January 24, 2014, DCFS conducted a TDM to address a safety action plan regarding the children. In attendance were mother, grandmother, a facilitator, the social worker, and the dependency investigator. The parties agreed to the following: Alex would remain with grandmother, Justin would remain with mother, mother would continue to have the right to monitored visitation with Alex, mother would comply with all court orders and the DCFS case plan, and mother and Justin would participate in Family Preservation Services. DCFS advised mother that she needed to submit to an on-demand drug test at PTL after the completion of the TDM. Later than day mother called the social worker and said that by the time she got to PTL it was closed. The social worker advised mother then she needed to go to another PTL location. Mother did so, however, PTL's drug result for this test stated: "unable to perform. [Mother] could not provide a urine sample."

Based upon mother's August 27, 2013 positive drug test, and her failure to complete a test since that date, the DCFS assessed that court intervention and DCFS supervision over Justin was required, and that Alex would be at significant risk of harm if she were released to mother. Therefore the DCFS recommended that the juvenile court (a) sustain the petition, declaring Justin and Alex dependents of the court; (b) release Justin to mother's custody with Family Maintenance Services for mother; (c) remove Alex from mother's custody and place her under DCFS supervision; and (d) provide mother with family reunification services, including participation in a drug treatment program, a 12-step Narcotics Anonymous program with a sponsor, a parent education program, and on-demand and random drug tests through PTL and Family Preservation Services.

In its February 10, 2014 Addendum Report, DCFS reported that the social worker instructed mother to submit to an on-demand test through PTL on February 2, 2014. However, mother failed to do so, claiming "I lost my way;" she couldn't find PTL.

9

Grandmother reported that she had spoken with mother by telephone on February 2, 2014. Mother had informed her that she did not want Alex seen by a psychologist, a mental health assessor, or a court appointed physician. She also send grandmother an e-mail message on that date, which stated: "I am fighting to get her [Alex] away from you. Yes, I would rather have her in the foster system than with you. I will even go as far as to admit to things that are not true if they will place her in a real foster home."

Grandmother then sent the following information to the social worker by e-mail: "Something I did not share with you, but you should know that Alex told me that she knew Justin did drugs. She took me to his room and showed me where he kept his drugs. At the time there were zig zag papers and some kind of flavoring that masks the smell of [marijuana] (I think). Alex told me at that time she was afraid that Justin and his friends do drugs in the house. When staying at [mother's home] last year, I was doing laundry and washed Justin's pants. He left his meth pipe in the pocket and it broke. I threw it away. Later I confronted [mother] regarding Justin's drug use and she said she [would] rather have him doing it in the house then out on the street. . . [¶] In May, when both my husband and I confronted [mother] about her drug use, she denied using drugs and said the meth pipe was not hers that [it] was probably Justin's."

At the February 10, 2014, combined jurisdiction and disposition hearing, the juvenile court received into evidence DCFS's reports with attachments. After DCFS rested its case, reserving the right to present rebuttal evidence if necessary, the juvenile court asked mother's counsel whether mother had any evidence to present. Mother's counsel stated that she would like to offer some stipulated testimony from mother. She did not present any additional documents or call any witnesses.

The stipulated testimony from mother was the following: "[T]hat the court ordered TDM occurred on January 24, 2014, mother was given a document to drug test at 4:15 p.m. that day, mother could not find her way to the testing site, she ended up testing at another site and urinated in a cup . . . [however, the specimen] was insufficient to drug test her, mother made another attempt to drug test in Tarzana, California [but] could not find that testing site, she then went to the original testing site but it was closed. Mother

10

had lived in the same apartment for 15 year, she had been working for the past five months at a law firm and was never arrested for possession of drugs." All counsel stipulated.

Counsel for the children submitted on the DCFS recommendation. Mother's counsel requested that the juvenile court dismiss the petition. After hearing counsels' arguments, the juvenile court announced that it found that the allegations in count b-1 of the petition to be true and found the children to be dependents described by section 300, subdivision (b).

In regard to the issue of disposition, mother's counsel requested that Alex be returned to mother. DCFS's counsel submitted on the reports and requested that mother be provided with reunification services, including parenting classes, individual counseling, and a DCFS-approved drug rehabilitation program. Alex's counsel joined in DCFS's recommendations.

After first noting that mother remained in denial in regard to her drug abuse problem, the juvenile court found by clear and convincing evidence, pursuant to section 361, subdivision (c), that as to Alex, there was a substantial risk to her safety, protection, physical and emotional health and well being if she were returned to mother's custody, and that there were no reasonable means to keep Alex safe in mother's home. The court ordered her removed from mother's custody and suitably placed with grandmother.

Mother filed a motion for reconsideration, which was denied. She then filed a Notice of Appeal, on February 24, 2014.

*Issue on Appeal*

*The juvenile court's jurisdictional findings were supported by substantial evidence*

In order for a juvenile court to sustain an allegation in a petition, the court must determine, by a preponderance of the evidence, if a child is described by section 300. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

Section 300, subdivision (b), provides in relevant part that a child may be declared a dependent of the court when: "The child has suffered, or there is a substantial risk that

11

the child will suffer, serious physical harm or illness, as a result of the failure or inability of the parent or guardian to adequately supervise or protect the child . . . , willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Proof of current risk of harm is not required to support the initial exercise of dependency court jurisdiction under section 300, subdivision (b), which is satisfied by a showing that the child has suffered or there is a substantial risk that the child will suffer, serious physical harm or abuse. (§ 300, subd. (b); *In re J.K.* (2009) 174 Cal.App.4th 1426, 1435.) Once the juvenile court assumes jurisdiction, the child shall continue to be a dependent child pursuant to section 300, subdivision (b), so long as necessary to protect him or her from the risk of suffering serious physical harm or illness. (*See In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

On appeal, jurisdictional findings are reviewed for substantial supporting evidence. (*In re James C.* (2002) 104 Cal.App.4th 470, 482.) Under this standard of review, this court must examine the whole record in the light most favorable to the findings and conclusions of the juvenile court, and defer to that court on issues of credibility of the witnesses. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734.) "[W]e must defer to the trial court's factual assessments. [Citation.] We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.]" (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.) The reviewing court should uphold the juvenile court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, resolve all conflicts in support of the juvenile court's determinations and indulge in all legitimate inferences in favor of affirmance. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547; *In re Eric B.* (1987) 189 Cal.App.3d 996, 1004-1005.)

In the present case there is ample evidence to support the juvenile court's jurisdictional findings over Justin and Alex, because in California, it is recognized that a

12

home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well being of a child. (§ 300.2.)

The evidence showed that mother had a long history of drug abuse dating back to 1997, when she was arrested for possession of a controlled substance. Grandmother stated that when Justin was just six years old, mother had a serious drug problem. She bought bongs at garage sales. "[Mother] will not take responsibility for her actions," and during the time that grandmother lived with mother and the children, between January and July, 2013, she observed both a methamphetamine pipe in the bathroom and a makeshift marijuana pipe in the cupboard in mother's home, within access of the children. She also found empty prescription drug bottles under Justin's bed, issued to people unknown to her. Additionally, grandmother observed mother "cleaning the cabinets all night long" and then "crash . . . go into a deep sleep for a full day." Mother had not entered into a drug program, and has not been able to quit using drugs for the past four years. "[Mother] will clean [herself] up for a while and then use drugs again." In 2013, mother badly burned her arm, which grandmother believed occurred while mother was making methamphetamine.

Grandmother stated that Alex was exposed to drugs in the home. She reported that there was a "glass thing" that spilled and "There is [an] odor that smells like the glass thing when they [Justin and Andrew] open and close the door to their room and the smells come out into the hallway." Alex also indicated Andrew's friend Eden recently brought over to the home her friend Tyler, who now also slept in Justin's bedroom. Alex said having strangers in her home scared her and made her sad.

Alex reported that mother and Justin argued about him smoking in the home as Justin smoked something in the home which smelled like the "glass thing." She told grandmother that she knew Justin did drugs, and showed her where Justin kept his drugs. When grandmother confronted mother regarding Justin's drug use, mother said that she would rather have him doing drugs in the home than out on the street.

Mother's long-standing drug problem was so serious that Alex's teacher, the school principal, the family's pastor and the parents of a friend of Alex all expressed concern regarding the children's well being as a result thereof. Alex's principal said that Justin "is a mess" who was moved out of Walter Reed Middle School due to being a problem child due as a result of mother's neglect. Alex's teacher was worried about Alex's well being. Alex came to class appearing disheveled, without her homework, and without lunch or lunch money. She was often left to walk home alone without any adult supervision. Further, calls from school about this problem were not returned by mother.

Mr. Poole, one of the family's pastors, said the children lived in an unstable home. Moreover, Susan and Van, the parents of Alex's classmate, were deeply concerned about the children's welfare because they could not reach mother for several consecutive days during the time when Alex stayed over at their home. In addition, when mother failed to pick up Alex from the after-care program, and Susan and Van took Alex home with them until mother could pick her up and take her home. Alex walked home alone from school, went to school without lunch or lunch money, and her living situation was tenuous. Van reported that when he took Alex home one day, he observed that there was a man living in the home. He was concerned about leaving Alex alone in the home with him.

Mother submitted to a drug test on August 27, 2013, and the test results were positive for methamphetamine and amphetamine. Mother also refused to comply with the court's order for drug testing claiming, among other excuses, that she couldn't find a location, that it was closed, and that she could not provide a specimen. When questioned about her positive drug test, mother could not come with any reason for same, other than to say she was "baffled."

Mother contends that all of the foregoing evidence "failed to show that she had a substance abuse problem that rendered her incapable of properly caring for her children. We submit that her failure to recognize her problem and its effect on the children is proof positive of its existence. Mother was too involved with her own substance abuse problems to focus on her children. (See *In re Stephen W.* (1990) 221 Cal.App.3d 629, 642-643.)

14

The case of *In re Drake M.* (2012) 211 Cal.App.4th 754, relied upon by mother is totally distinguishable from the present case. Unlike the situation in *Drake,* here there was substantial evidence that due to her drug usage, mother was unable to provide proper care for the children, resulting in the children being put at substantial risk of suffering physical harm.

Mother also relies upon *In re Destiny S.* (2012) 210 Cal.App.4th 999, to support her argument that her drug abuse was not putting the children at substantial risk. In that case, the evidence was that the minor was a *"*healthy, happy, pre-teen." (*Id.,* at pp. 1001-1002.) Additionally, her mother had tested clean for marijuana and methamphetamine for three months prior to the court's jurisdictional order. By contrast, in the present case the evidence showed that neither child was being properly care for, neither one was doing well, and mother had never tested clean on a single occasion during the entire proceedings.

In short, the juvenile court's assumption of jurisdiction over Justin and Alex is supported by substantial evidence.

A removal order is proper if it is based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn.6.) The court may consider a parent's past conduct as well as present circumstances. (*In re Troy D.* (1989) 215 Cal.App.3d 889, 900.)

Before the juvenile court can issue a removal order, it must find that the child's welfare requires that he or she be removed from parental custody because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and that there are no reasonable alternative means to protect the child. (§ 361, subd. (c)(1); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

15

Whether the conditions in the home present a risk of harm to the children is a factual issue and is also reviewed for substantial evidence. (*In re Kristin H., supra,* 46 Cal.App.4th at p. 1654.) Under this standard, an appellate court must affirm the juvenile court's order if there is evidence that is reasonable, credible, and of solid value to support the order. (*In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080.) The evidence must be considered "in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

In the present case, the evidence that supports a finding of jurisdiction also supports the juvenile court's dispositional findings and orders. Additionally, it is appropriate for a juvenile court to consider a parent's level of denial when determining the risk to the child if placed with the parent. (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.) The court here could reasonably conclude that mother's denial of her substance abuse problem reflected an underlying resistance to the treatment needed to effect the behavior changes that would ensure the children's safety.

In addition, mother's refusal to accept responsibility for her actions is a legitimate factor for the juvenile court to consider when assessing whether there was a substantial risk of future serious injury. As previously noted, mother was in complete denial of her unresolved drug abuse issues that had been ongoing for at least 10 years. When mother's August 2013 drug test result was positive for both methamphetamine and amphetamine, she claimed "[E]verything's been blown out of proportion," and there was no truth to the allegations of her drug abuse issues. Grandmother said that mother had a drug problem and "[Mother] will not take responsibility for her actions." Although mother's trial counsel claimed that mother had maintained a stable and clean and safe residence for 15 years, counsel ignored that following situations: (a) random people were allowed to move in and out of the home; (b) the home was at time infested with bedbugs; (c) drugs and drug paraphernalia were located in the home and drugs were being consumed in the home; (d) mother was unable to even arrange for Alex's transportation to and from school and after school care; (e) mother did not stay in contact with the school authorities

16

even when her son was being kicked out of school and her 9-year-old daughter was walking home from school unattended; (f) the children were going to school without lunch or lunch money; (g) the children were going to school not properly groomed or dressed; (h) Justin was not doing any of his homework; and (i) Justin was ditching school.

Mother argues that the juvenile court's safeguards put into place regarding Justin, which included requiring mother to complete random drug testing and working with his school to ensure his attendances, and DCFS's ability to conduct unannounced visits to the home and to search the premises for drugs, provided reasonable means to protect Alex without removing her from her mother's custody. However, given that mother previously demonstrated that she refused to acknowledge that she had a drug abuse problem, was oblivious to the effect it had on her children's welfare, and refused to submit to court-ordered drug testing, there was no way to guarantee Alex's physical health, well-being and protection while living with mother.


*Disposition*

The orders of the juvenile court are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]


We concur:


MOSK, ACTING P. J.                    KRIEGLER, J.


---

[*]     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17